LUTHERAN GENERAL HOSPITAL,
Plaintiff,

v.

WENDY'S INTERNATIONAL, INC., an
Ohio corporation; Wendy's Internation-
al Health Benefit Plan; and Metropoli-
tan Life Insurance Company, a legal
reserve stock company, Defendants.

No. 95 C 7445.

United States District Court,
N.D. Illinois,
Eastern Division.

March 13, 1997.

Joel D. Teibloom, Flamm, Teibloom &
Laytin Ltd., Chicago, IL, for Plaintiff.

Joseph J. Hasman, Peterson & Ross, Chi-
cago, IL, for Defendant Metropolitan Life.

Joshua G. Vincent, Hinshaw & Culbertson,
Chicago, IL, for Wendy's Intern.

### MEMORANDUM OPINION AND ORDER

KEYS, United States Magistrate Judge.

Before the Court are Defendants' Motions
to Dismiss, or, In the Alternative, for Sum-
mary Judgment; and Plaintiff's Cross–Mo-
tion for Summary Judgment. For the rea-
sons set forth below, the Motions to Dismiss
are denied and the Defendants' Motions for
Summary Judgment are granted.

### Material Facts

At all times material herein, Maryann
McGivern and John Romito were employed
as management level employees by Defen-
dant Wendy's International, Inc. ("Wen-
dy's"). Wendy's International Health Bene-
fit Plan ("Wendy's Health Plan" or "Plan")
is a self-funded health insurance plan for
Wendy's employees and their dependents.

Metropolitan Life Insurance Company ("MetLife") is an administrator of the Plan, performing certain administrative services, including the initial processing of claims for benefits thereunder.

As of November 10, 1993, both Maryann McGivern and John Romito were enrolled for individual medical benefits coverage with the Plan. The bi-weekly contribution rates for medical coverage was $20.00 for single coverage and $50.00 for family coverage. At that time, Ms. McGivern was seven months' pregnant and expected delivery on or about January 19, 1994. However, on November 10, 1993, she went into premature labor and was taken to Lutheran General Hospital ("Plaintiff" or "Lutheran General"), where she gave birth to a son, Brandon Romito. John Romito is the father of Brandon Romito. Also on November 10, 1993, Ms. McGivern signed a form seeking dependent coverage under the Plan. The form was received in the Human Resources Department of Wendy's corporate headquarters on November 16, 1993. Upon admission to the hospital, Ms. McGivern executed an assignment of benefits in favor of the hospital.

Brandon Romito was hospitalized from November 10, 1993 to December 23, 1993 at Lutheran General Hospital, and his medical expenses totaled $89,021.36. On December 31, 1993, John Romito submitted a form seeking family coverage under the Plan, which form was received in the Human Resources Department of Wendy's corporate headquarters on January 5, 1994.

On December 13, 1993, MetLife received the first claim for medical benefits on behalf of Brandon Romito, in the amount of $1,500.00 from Dr. John David McKenzie, for services performed on November 22, 1993. There was nothing in MetLife's computer system to indicate that Brandon had received any medical treatment between November 10, 1993, his date of birth, and November 16, 1993, the earliest date on which his coverage could have begun, so there was no need to investigate whether the treatment rendered by Dr. McKenzie on November 22, 1993 related to a pre-existing condition. Therefore, the portion of that bill which MetLife considered to be reasonable and customary was paid. Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment and Plaintiff's Cross–Motion for Summary Judgment ("Pl.'s Resp. Opp."), Exh. A, and Reply in Support of Defendants' Motions to Dismiss and for Summary Judgment ("Defs.' Reply"), Exh. I.

On February 28, 1994, MetLife received a claim for medical benefits on behalf of Brandon from Lutheran General Hospital. This was the first claim to identify treatment prior to November 16, 1993. A computer print-out showed that Brandon had been hospitalized from November 10, 1993 to December 23, 1993, but that Ms. McGivern's family coverage was not added until November 16, 1993. Therefore, the claims processor was alerted by the computer to investigate the possibility that the treatment for which Lutheran General was seeking payment related to a pre-existing condition. (Defs.' Reply, Exh. I.) On March 4, 1994, after contacting Wendy's and verifying that the November 16, 1993 effective date for family coverage was correct, that Brandon was hospitalized on that date, that his coverage did not begin until after he was discharged, and that the pre-existing condition provision applied, MetLife denied the payment. (Defs.' Reply, Exh. I.)

Notwithstanding the March 4, 1994 computer alert that requests for payments for services performed during Brandon's hospitalization were to be denied, a claims processor did approve payment of a claim in the amount of $80.00 from Dr. David Mittelman for services performed on December 22, 1993. This was due to a claim-processing error. (Pl.'s Resp. Opp., Exh. A; Defs.' Reply, Exh. I.)

### Standard for Motion to Dismiss

The purpose of a motion to dismiss, brought under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted, is to test the sufficiency of the complaint. *Chicago Dist. Council of Carpenters Pension Fund v. G & A Installations, Inc.,* No. 95 C 6524, 1996 WL 66098, at *1 (N.D.Ill. Feb. 8, 1996). In deciding a Rule 12(b)(6) motion, the Court accepts as true all well-pled factual allegations in the complaint, and draws all reason-

able inferences therefrom in the plaintiff's favor. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *Lashbrook v. Oerkfitz,* 65 F.3d 1339, 1343 (7th Cir.1995); *Harris v. City of Auburn,* 27 F.3d 1284, 1285 (7th Cir.1994).

■ Defendants contend that the Complaint should be dismissed because the Court lacks subject matter jurisdiction to entertain this action because Lutheran General lacks standing herein. In this regard, Defendants argue that the assignment of rights executed by Ms. McGivern in favor of Lutheran General on November 10, 1993 was not made by a "participant" or "beneficiary" within the meaning of 29 U.S.C. § 1132(a)(1)(B). They argue further that the Plan's language does not provide Lutheran General with a "colorable claim" in its own right, *citing Sallee v. Rexnord,* 985 F.2d 927 (7th Cir.1993); *Kennedy v. Connecticut General Life Ins. Co.,* 924 F.2d 698 (7th Cir.1991).

Lutheran General notes that the Plan includes dependents under its definition of a "participant" and argues that, therefore, Brandon was a participant within the meaning of 29 U.S.C. § 1132(a)(1)(B). It also argues that Lutheran General is a beneficiary, since it has a "colorable claim" to benefits.

The Court, having carefully reviewed the parties' respective arguments, the cases relied upon by them, the Statute and the Plan's language in this regard, is unable to conclude that the case should be dismissed for lack of jurisdiction. Therefore, Defendants' Motions to Dismiss are denied.

*SUMMARY JUDGMENT STANDARD*

Summary judgment is appropriate when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In a motion for summary judgment, the initial burden is on the moving party to show an absence of genuine issues of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). When the movant meets this burden,

the opposing party, with the burden of proof, "... may not simply rest on its pleadings, but must affirmatively demonstrate with specific factual allegations that a genuine issue of material fact exists and requires trial." *Morgan v. Harris Trust and Sav. Bank of Chicago,* 867 F.2d 1023, 1026 (7th Cir.1989) (citing *Beard v. Whitley,* 840 F.2d 405, 409–10 (7th Cir.1988)). There are no genuine issues for trial if, when looking at the record, a rational trier of fact could not find for the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

In deciding a motion for summary judgment, the court must view all facts in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). However, the non-movant must show more than a mere "colorable" factual dispute to survive summary judgment. *Lloyd v. Bridgeport Brass Corp.,* 811 F.Supp. 401, 404 (S.D.Ind.1993). The disputed facts must be outcome determinative. *Id.*

*Discussion*

■ The portions of the Plan that are relevant herein are Sections 4.2 and 4.3 of Article IV and Section 16.2(d) of Article XVI. Section 4.2 provides as follows:

4.2 *Commencement of Coverage—Dependents*—If an Employee is eligible for, and enrolled in, any Health Care Benefit coverage, he may elect to extend such coverage to his Dependent(s). Dependent coverage shall commence on the later of:

(a) the date the Employee's coverage commences, or

(b) the date the Employee enrolls his Dependent(s) in accordance with Section 4.3 of this Plan, or

(c) the date the Employee acquires the Dependent(s).

Notwithstanding the above, if a Dependent is hospitalized on the date coverage is to commence, coverage shall not commence until that Dependent has been released from the Hospital for at least 24 hours.

Wendy's Motion to Dismiss or, In the Alternative, for Summary Judgment ("Wendy's Mot; to Dismiss"), Exh. E at 14.

The relevant portions of Section 4.3 provide as follows:

4.3 *Enrollment Requirements*—Health Care Benefit and Optional Life Insurance are voluntary coverages, for which employees must contribute. Before any of these coverages will commence, an Employee must affirmatively enroll for those coverages for himself or, himself and his Dependent(s).

To enroll for coverage, the Employee must complete an enrollment form approved by the Plan Administrator, and submit that form to the Plan Administrator. An enrollment shall not be completed until all necessary enrollment information has been received by the Plan Administrator.

Wendy's Mot. to Dismiss, Exh. E at 14–15.

Article XVI, Section 16.2(d) provides as follows:

(d) The Plan Administrators shall have the sole responsibility for the administration of the Plan; and, except as herein expressly provided, the Plan Administrators shall have the exclusive right to interpret the provisions of the Plan and to determine any questions arising hereunder or in connection with the administration of the Plan, including the remedying of any omissions, inconsistency or ambiguity, and its decision or action in respect thereof shall be conclusive and binding upon any and all Participants or former Participants.

Wendy's Mot. to Dismiss, Exh. E at 71–72.

In view of the provisions of Section 16.2(d), which gives the Administrators discretionary authority to interpret the provisions of the plan, the Court's standard of review of the denial of benefits herein is under an arbitrary and capricious or abuse-of-discretion standard. *Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989).

Under Section 4.3, coverage for Brandon could not have commenced until November 16, 1993, the date on which the Plan Administrator received the enrollment form completed by Ms. McGivern on November 10, 1993. Section 4.2 provides, however, that since Brandon was hospitalized on the date coverage was to commence, the coverage did not commence until 24 hours after he was released from the hospital, December 24, 1993. Therefore, under the plain language of the Plan, none of the expenses incurred by Brandon between November 10, 1993 and December 23, 1993 were covered.

In a 20–page document titled, "Your Employee Benefit Program", which all participants receive, the Plan's coverage of dependents is described, in part, as follows:

Since the participation in the Optional Life Insurance, and the Medical and Dental Plan is voluntary, coverage for these benefits cannot begin until you have enrolled and authorized the necessary payroll deductions. Your coverage for these benefits will begin on the later of:

- the date you are eligible to participate in the group insurance program, provided you submitted the necessary enrollment form to the Human Resources Department at Wendy's Corporate Headquarters on or before that date, or;

- the date your enrollment form is received by the Human Resources Department at Wendy's Corporate Headquarters.

\* \* \* \* \* \*

If a *dependent* is hospitalized on the date coverage for that *dependent* would otherwise begin coverage for that *dependent* will not begin until he/she has been released from the hospital for at least one full day.

We urge you to enroll for dependent coverage well in advance of the date you will acquire *dependents* (e.g., through marriage, adoption or the birth of a child, etc.), to be sure they are covered as soon as they become your *dependents*.

Wendy's Mot. to Dismiss, Exh. F at 2.

It is noted that Mr. Romito had been enrolled for single coverage in the Plan since November 19, 1990 and Ms. McGivern had been enrolled for single coverage since May 8, 1992. (Wendy's Mot. to Dismiss, Exhs. A and B.) Together, they saved $60.00 per

month by continuing under their respective single Plans after Ms. McGivern became pregnant. Whether they intended to take advantage of the lower, single rates up until the last possible month before the expected date of delivery is not shown by the record. In any event, had Ms. McGivern not gone into premature labor and been hospitalized, this, perhaps, would have been a wise decision. This is apparently the type of situation contemplated by Wendy's in its explanations and caveat to its employees.

Lutheran General contends that Defendants' interpretation of the Plan, as set forth in the employee booklet, constitutes an abuse of discretion because it is inconsistent with other terms of the Plan and because it incorrectly interprets the Plan to require inconsistent results for similarly situated individuals. (Pl.'s Resp. Opp. at 4.) In this regard, Lutheran General cites Article XI, Section 11.6(h) of the Plan, which allows coverage for routine nursery care for a newborn child and the initial pediatrician's examination. It contends that it is impossible to reconcile this Section with Defendants' interpretation of Section 4.2, which would totally preclude newborn dependent coverage for in-patient hospitalization prior to a hospital discharge.

It is noted, however, that Section 4.2 deals with when coverage begins, and that Section 11.6(h) sets forth one of the types of expenses the Plan will pay on behalf of "participants" who are covered. Section 11.6(h) presupposes that coverage has already been established under Section 4.2. Reimbursement was denied here because *Brandon*— who required the nursing care—was not covered, not because of any coverage questions concerning Ms. McGivern. The Court finds that Defendants' interpretation in this regard did not constitute an abuse of discretion.

Lutheran General argues further that Defendants' initial actions regarding Brandon's coverage belie their assertion that he was not covered. It notes that Ms. McGivern's November 10, 1993 application for dependent coverage, which was received and approved on November 16, 1993, initially showed November 10, 1993 as its "effective date" and that that date was then crossed out. Luther-

an General notes that Defendants have not explained why the November 10, 1993 date was later crossed out, inferring that Defendants first conceded that Brandon was covered, then reversed themselves. Lutheran General also notes that Defendants made payments to Drs. McKenzie and Mittelman for services rendered to Brandon prior to November 16, 1993, and that this also indicated a later reversal of their decision regarding his coverage. (Pl.'s Resp. Opp. at 6–7.)

As set forth above, when MetLife received the claim from Dr. McKenzie for his services rendered to Brandon on November 22, 1993, which was the first claim received, there was no reason to question whether he was covered. The payment made to Dr. Mittelman was due to a claim-processing error. Lutheran General's assertion that these two incidents—in which errors were made in Brandon's favor, then reversed—indicate that Defendants created an entirely separate theory to justify their prior actions, is rejected. With respect to the November 10, 1993 application completed by Ms. McGivern, it was not *received* by Defendants until November 16, 1993, which is the date on which it also became effective. Therefore, the question as to why the date November 10, 1993 was initially entered as the "effective date" is irrelevant.

■ Paragraph 24 of the Amended Complaint alleges that, upon Ms. McGivern's admission to the hospital, Lutheran General contacted MetLife to confirm coverage and that MetLife verified that Ms. McGivern and Brandon were covered under the Plan. Defendants denied this allegation in their Answers to the Complaint. Lutheran General also made this allegation in its 12(M) statement, which was again denied by Defendants. Plaintiff's Response to Defendants' Rule 12(M) Statement of Uncontested Facts, ¶ 3; Defendants' Response to Plaintiff's Rule 12(M) Statement of Uncontested Facts, ¶ 3. No evidence has been presented in support of this allegation. Lutheran General now asserts that Defendants have failed to offer any evidence disputing its allegation that MetLife initially verified Brandon's coverage and that, in reliance upon this representa-

tion, it provided medical services and treatment to Brandon. Therefore, Lutheran General argues, Defendants are estopped from denying the coverage. (Pl.'s Resp. Opp. at 8–9.)

■ Putting aside the question as to whether Defendants, having denied an allegation of the Complaint, had an affirmative obligation to present evidence to support its denial, the Court now considers whether the estoppel theory applies to this case. In support of its contention, Lutheran General cites *Black v. TIC Investment Corp.*, 900 F.2d 112 (7th Cir.1990), and *Kane v. Aetna Life Insurance Co.*, 893 F.2d 1283 (11th Cir.1990), *cert. denied*, 498 U.S. 890, 111 S.Ct. 232, 112 L.Ed.2d 192 (1990). Both cases are distinguishable.

In *Black*, the plaintiff ("Mr. Black") was a participant in his employer's "Severance Pay Allowance Plan," under which employees who were terminated would receive payments based on the length of their service with the company. The company subsequently filed a Chapter 11 Bankruptcy Petition. Several months later, Mr. Black was terminated. His termination notice informed him that he could either file a claim in bankruptcy court for his severance benefits of $18,469 or the company would immediately give him two months' salary continuation, without the need to file a claim. Mr. Black opted to file his claim in the bankruptcy court rather than take the offer of immediate cash. The employer then objected to all bankruptcy claims for severance pay for employees who were terminated after a certain date, which included Mr. Black. The bankruptcy court approved payment of 65% of each severance pay claim that was not objected to by the employer, and dismissed Mr. Black's claim.

Mr. Black filed suit in district court alleging, *inter alia*, that the employer had breached its fiduciary duty by objecting to his claim in the bankruptcy court and that it was estopped to deny the validity of his severance pay claim. The district court held that the Severance Pay Allowance Plan was a Welfare Benefit Plan, which the employer could unilaterally eliminate without violating ERISA. The district court rejected Mr. Black's estoppel argument, holding that it could not be

raised in ERISA cases. *Black*, 900 F.2d at 113.

The Seventh Circuit noted that the rationale for the reluctance of courts to allow estoppel in ERISA cases is that most of such suits involve multi-employer plans, with multiple fiduciaries with control over a common fund, and that, to allow one employer to bind the plan to pay benefits outside the strict terms of the plan would be to make all employees pay for one employer's misrepresentations, which could damage the soundness of the plan, thereby hurting all employees. With this rationale in mind, the Seventh Circuit noted that, in cases involving single-employer, unfunded plans, there is no danger of the actions of one employer damaging other employers and employees and that, therefore, there is no reason not to apply the general rule that misrepresentations can give rise to an estoppel. It held, therefore, that "estoppel principles are applicable to claims for benefits under unfunded single-employer welfare benefit plans under ERISA." *Black*, 900 F.2d at 115 (emphasis added).

It is undisputed that Wendy's Health Plan is a single-employer, *self-funded* health insurance plan. Therefore, even if Lutheran General could show that some individual at MetLife had verified that Brandon was covered under the plan, and that this was the reason it provided services to him, the doctrine of estoppel would not be available to force payment for those clearly non-covered expenses.

In *Kane*, Mr. and Mrs. Kane wanted to adopt a prematurely born child who had serious medical complications. Mr. Kane, who was covered under his employer's medical benefit plan, had Mrs. Kane call Aetna, which administered the plan for the employer, to inquire as to whether, in the event they adopted the child, the child's future medical expenses would be covered. The Aetna representative was informed that the child was hospitalized at the time of the inquiry. The representative informed Mrs. Kane that the child would be covered effective as of the date of commencement of formal legal adoption proceedings. When a representative of the hospital at which the child was hospital-

ized contacted Aetna, she was also give the same assurances. The Kanes adopted the child, who amassed substantial medical expenses for which the Kanes filed a claim. Aetna refused the claim, citing a provision of the plan which indicated that coverage was not available for expenses for which the hospitalization began prior to the effective date of coverage. It argued that, since formal adoption proceedings did not begin until after the commencement of the child's hospitalization, it was not obligated to pay for any of the medical expenses. *Kane,* 893 F.2d at 1284–85.

The Eleventh Circuit found that the relevant language of the plan was ambiguous with respect to the "effective date of coverage" and that Aetna's representatives, in advising Mrs. Kane and the hospital that the child was covered, gave them her oral *interpretations* of the plan—about which reasonable individuals might disagree. It found further that her advice could not be construed as an amendment or modification of the plan, only a reasonable interpretation of the effective date of the coverage provision. The court held that, in the circumstances of that case, to require Aetna to adhere to its oral interpretations of the plan's provisions would not undermine the integrity of the plan. *Kane,* 893 F.2d at 1286.

### CONCLUSION

Whether Brandon was covered for medical benefits under the Plan must be determined by the provisions of the Plan. Under Section 4.3 of Article IV of the Plan, the earliest date on which Brandon could have been covered was November 16, 1993, the date on which Ms. McGivern's application to add him as a dependent was received by the Administrator. However, under Section 4.2 of Article IV, because Brandon was hospitalized at the time his coverage would otherwise have commenced, his coverage did not commence until December 24, 1993, 24 hours after his discharge from the hospital. Under the clear and unambiguous terms of the Plan, Brandon was not covered for the services provided to him by Lutheran General between November 10, 1993 and December 23, 1993. Moreover, defendants are not estopped from asserting that the services provided herein were not covered by any equitable principles. There is no genuine issue as to any material fact and defendants are entitled to judgment as a matter of law. Accordingly, it is hereby ordered that defendants' motions for summary judgment be, and the same hereby are, granted.